## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CREATIVE CONSUMER                )
CONCEPTS, INC.,                        )
                                                )
                Plaintiff,        )
                                                )        **CIVIL ACTION**
v.                                             )
                                                )        **No. 05-2045-CM**
                                                )
LAURA KREISLER,                    )
                                                )
                Defendant.       )
_____)

## MEMORANDUM AND ORDER

Plaintiff Creative Consumer Concepts, Inc. ("CCC") brings this case against its former employee defendant Laura Kreisler, alleging the following claims: breach of fiduciary duty, faithless servant, fraudulent misrepresentation, fraud by silence, conversion, and rescission. CCC's claims arise out of an agreement the parties executed in connection with defendant's termination (the "Severance Agreement"). The court conducted a hearing on the sole issue of the validity of the Severance Agreement. After the hearing, defendant filed a Motion to Strike Evidence Relating to Lack of Authority (Doc. 80). The court is now prepared to rule on defendant's motion to strike and issue its findings of fact and conclusions of law regarding the validity of the Severance Agreement in accordance with Fed. R. Civ. P. 52(a).

## I.      DEFENDANT'S MOTION TO STRIKE

At the beginning of this litigation, the parties agreed to have a bench hearing to determine the validity of the Severance Agreement. The original Scheduling Order set the date of the bench hearing and a specific discovery deadline for issues relating to the validity of the agreement. Defendant never objected to the hearing or requested a jury trial on the issue. Pre-hearing briefs

were due a week before the bench hearing.  The parties submitted briefs regarding the issue of

whether the Severance Agreement was procured by fraud.  At the beginning of the hearing, plaintiff

submitted a second brief in which it argues that Ms. Flanigan, the person who executed the

Severance Agreement for CCC, did not have authority to execute the agreement.  Defendant's

counsel objected to the lack of authority evidence and indicated that defendant could rebut some of

the facts plaintiff relied upon; however, he could not direct the court to evidence that he thought

would have an impact on the issue.  The court informed defense counsel that defendant would have

the opportunity to respond in her proposed findings of fact and conclusions of law.  After the

hearing, both parties submitted proposed findings of fact and conclusions of law.

Defendant requests that the court strike the evidence regarding Ms. Flanigan's authority to

execute the Severance Agreement.  Defendant contends that the authority issue is not properly

before the court because (1) defendant is entitled to a jury trial on the issue and (2) plaintiff did not

raise lack of authority as an affirmative defense in its Response to Defendant's Counterclaim (Doc.

8) or anytime before the bench hearing.

The court will first consider whether defendant is entitled to a jury trial on the issue of lack

of authority.  Under Kansas law, "what constitutes an agency and whether there is any competent

evidence that reasonably tends to prove the agency relationship is a question of law" for the court,

but "[w]hether an agency exists is a question for the finder of fact."  *Town Ctr. Shopping Ctr., LLC*

*v. Premier Mortg. Funding, Inc.*, 148 P.3d 565, 569 (Kan. Ct. App. 2006).

In this case, the court is the factfinder on the validity issue.  The parties submitted the

validity question to the court.  Plaintiff's legal theories of fraud and lack of authority relate directly

to whether the Severance Agreement is valid.  In addition to presenting evidence at the hearing, the

parties were given the opportunity to submit, and did submit, findings of fact and conclusions of law on the issue. By agreeing to a bench hearing on the validity of the agreement, defendant consented to having the court determine the factual and legal questions related to the issue.

The court next considers defendant's argument that the authority evidence should be stricken from the record because plaintiff did not plead lack of authority as an affirmative defense and did not raise the theory until the day of the bench hearing. In this instance, lack of authority is a legal theory relied on by plaintiff to support its rescission claim. Plaintiff was not required to inform defendant of all of its legal theories prior to the hearing; the parties never agreed to limit the hearing to the issue of fraud. The parties had the opportunity to respond to the evidence presented in their proposed findings of fact and conclusions of law. The court therefore finds that the parties have had an opportunity to fully present the issues relating to the validity of the Severance Agreement, including Ms. Flanigan's authority, to the court. Defendant's Motion to Strike is Denied.

## II.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.   FINDINGS OF FACT

**Background**

1.   Founded by Bob Cutler in 1987, CCC is an integrated brand-marketing agency that helps restaurant chains market to children and families.

2.   Mr. Cutler is the CEO and sole shareholder of CCC.

3.   In July 1998, CCC hired defendant to work in its financial and human resources departments.

4.   In June 2002, defendant was promoted to CCC's leadership team. In June 2003, defendant was promoted to Vice-President of Finance and Operations.

5.   While at CCC, defendant lead the human resources department, where she helped prepare and execute severance agreements on CCC's behalf.

**Defendant's Termination**

6.      In the fall of 2004, Mr. Cutler decided to terminate defendant because she had made comments about him during a leadership team meeting.

7.      On November 5, 2004, Mr. Cutler met with defendant offsite and terminated her.

8.      Defendant thought she was being terminated because Mr. Cutler suspected her of stealing from CCC.

9.      At the time that he decided to terminate defendant, Mr. Cutler did not know that defendant had embezzled funds from CCC.[1]

10.     At her termination meeting, Mr. Cutler presented defendant with a proposed severance agreement (the "Original Severance Offer") for her consideration.  (Pl.'s Ex. 1.)

**The Agreements**

11.     The Original Severance Offer provided defendant certain benefits in exchange for releasing any potential legal claims she might have against CCC.

12.     The Original Severance Offer did not release defendant of claims that CCC might have against her.

13.     Defendant wanted to make several changes to the Original Severance Offer.

14.     In order to make the changes, she scanned the Original Severance Offer into her home computer and edited the document.

15.     Defendant made the following changes to the document:

   a.      In Paragraph 2, she added, "Additionally, CCC releases employee from any claims against her resulting from her actions while employed by CCC," which converted the release into a mutual release.

_____

[1]  See Johnson County Case No. 05CR01639.

-4-

b.      In Paragraph 6, she added language to make the warranties mutual.

16.     Defendant added the mutual release language so that CCC would release her from any claims they may have against her for theft.

**Execution of the Severance Agreement**

17.     After making the changes, defendant executed the new document, the Severance Agreement, and had it notarized.  (Pl.'s Ex. 2.)

18.     On or about November 15, 2004, defendant met CCC's Human Resources Manager, Ms. Flanigan, at the Wendy's restaurant located near CCC's office.

19.     During the meeting, defendant handed Ms. Flanigan the Severance Agreement, saying  "Here it is.  And will you give this to Bob so that I can get my paycheck?"

20.     Defendant did not tell Ms. Flanigan that she had altered the Original Severance Offer or that the Severance Agreement contained new terms.  And the two women did not discuss the terms of the agreement.

21.     Defendant thought that Ms. Flanigan would take the Severance Agreement back to Mr. Cutler.  She assumed that Mr. Cutler would read the agreement or have someone read it for him.

22.     At the time of the meeting, Ms. Flanigan thought that the Severance Agreement was the Original Severance Offer.

23.     After receiving the document from defendant, Ms. Flanigan skimmed the document, checked the dates, and read the first couple of sentences of paragraphs one and two.

24.     Believing the document to be the same agreement that Mr. Cutler had provided defendant and unaware of the addition of the mutual release, Ms. Flanigan signed the document in front of defendant.

25. Had Ms. Flanigan been aware of the changes defendant made to the Original Severance Offer, she would not have signed the Severance Agreement; instead, she would have taken it to Mr. Cutler for approval.

26. After signing the Severance Agreement, Ms. Flanigan took it back to CCC and had a copy made and mailed to defendant.

27. After the parties signed the agreement, CCC began to pay defendant severance pay, offered outplacement services through Right Management, and offered COBRA as provided for in both the Original Severance Offer and the Severance Agreement.

### Discovery of the Differing Terms

28. On or about November 22, 2004, Vicki Davis, one of CCC's accounting employees, began reconciling CCC's controlled disbursement account ("CDA").

29. During her reconciliation, she discovered irregularities in CCC's CDA.

30. On December 6, 2004, Ms. Davis informed Ms. Flanigan about the irregularities.

31. The next day, December 7, 2004, Ms. Davis and Ms. Flanigan informed Mr. Cutler of the irregularities in the CDA.

32. After learning of the irregularities, CCC reviewed the Severance Agreement.

33. Upon review of the Severance Agreement, CCC discovered that the Severance Agreement it had executed contained a mutual release that was not included in the Original Severance Offer.

34. That day, CCC stopped providing defendant benefits under the Severance Agreement.

35. On December 15, 2004, Mr. Cutler told defendant that CCC would no longer perform its obligations under the Severance Agreement.

### CCC's Protocol for Severance Agreements

36. CCC has the following protocol for creating and executing severance agreements: (1) the Human Resources Department and the employee's supervisor make a severance package recommendation to Mr. Cutler; (2) Mr. Cutler decides the final terms of the offer; (3) the Human Resources Department incorporates the approved severance offer into CCC's standard separation agreement form; (4) someone from the Human Resources Department meets with the employee to review and discuss the offer and asks the employee to execute the agreement; and (5) if there are no changes, the Human Resources representative executes the agreement on behalf of CCC.

37. The protocol changes slightly if the employee wants to negotiate any terms of the offer because all changes must be approved by Mr. Cutler.

38. CCC has never given an employee a mutual release.

39. Mr. Cutler did not authorize any employee to enter into a mutual release with defendant.

**Defendant's Knowledge of CCC's Protocols**

40. CCC's severance protocol was the same when defendant worked at CCC.

41. Because defendant participated in the severance agreement process during her time at CCC, she was aware of CCC's protocol for negotiating and executing severance agreements.

42. Although defendant was involved with preparing severance agreements for CCC during her tenure at CCC, she never had authority to execute severance agreements that differed from the original offer approved by Mr. Cutler. And she knew that no other CCC employee had the authority to execute agreements unless Mr. Cutler had approved the final terms.

43. While defendant was at CCC, agreements were never signed without Mr. Cutler reading the document or asking if the person acting on CCC's behalf had read the document.

**Ms. Flanigan's Authority**

44.     Ms. Flanigan is, and was at all relevant times, CCC's human resource manager.

45.     Until August 2004, Ms. Flanigan reported to defendant.

46.     After August 2004, she reported to Mr. Cutler.

47.     She was involved in the preparation of severance agreements, but had no authority to
        negotiate or determine the terms of the agreements.

48.     There was no written policy defining the scope of Ms. Flanigan's authority, but Ms. Flanigan
        knew that she was only authorized to execute severance agreements that CCC had offered to
        the employee.  Any proposed changes to the terms or conditions of the severance agreement
        had to be presented to Mr. Cutler for his approval.

49.     Ms. Flanigan was authorized to execute the Original Severance Offer, but she was not
        authorized to agree to any modification of the offer.

50.     Ms. Flanigan was not authorized to agree to a mutual release.

        **B.      CONCLUSIONS OF LAW**

                                            **Fraud**

1.      Plaintiff alleges that the Severance Agreement is invalid because it was procured by fraud,
        arguing that defendant's failure to notify CCC about the changes in the agreement constitutes
        fraud by silence.

2.      "Concealment of the truth is not always actionable fraud." *Boegel v. Colo. Nat'l Bank of
        Denver*, 857 P.2d 1362, 1365 (Kan. Ct. App. 1993) (citation omitted).  To establish fraud by
        silence under Kansas law, plaintiff must establish the following elements by clear and
        convincing evidence:

                (1) that defendant had knowledge of material facts which plaintiff did not
                have and which plaintiff could not have discovered by the exercise of
                reasonable diligence; (2) that defendant was under an obligation to

communicate the material facts to the plaintiff; (3) that defendant intentionally failed to communicate to plaintiff the material facts; (4) that plaintiff justifiably relied on defendant to communicate the material facts to plaintiff; and (5) that plaintiff sustained damages as a result of defendant's failure to communicate the material facts to the plaintiff.

See *Lesser v. Neosho County Cmty Coll.*, 741 F. Supp. 854, 863 (D. Kan. 1990) (citing

*DuShane v. Union Nat'l Bank*, 576 P.2d 674 (Kan. 1978)).

3.   A fact is material if a reasonable person "would attach importance [to it] in determining his

choice of action in the transaction in question." *Griffith v. Byers Constr. Co. of Kan., Inc.*,

510 P.2d 198, 205 (Kan. 1973).

4.   A change in the terms of the original offer, such as the changes made by the defendant,

would undoubtably be important in determining a party's choice of action.  The court finds

that defendant's insertion of the additional terms into the agreement is a material fact.

5.   To be liable for fraud by silence, "[t]here must be a concealment of facts which the party is

under a legal or equitable duty to communicate and in respect of which he could not be

innocently silent." *Boegel*, 857 P.2d at 1365 (quoting *Moore v. State Bank of Burden*, 729

P.2d 1205 (Kan. 1986)).

6.   Kansas courts have recognized two situations in which a duty to disclose may exist: (1) when

there is a fiduciary relationship between the parties and (2) when there is a disparity of

bargaining powers or of expertise between two contracting parties. *Great Plains Christian*

*Radio, Inc. v. Cent. Tower*, 399 F. Supp. 2d 1185 (D. Kan. 2005) (citing *DuShane*, 576 P.2d

at 674); *see also Boegel*, 857 P.2d at 1365.

7.   Plaintiff does not, nor could it, assert that a fiduciary duty exists between the

parties—defendant was plaintiff's former employee at the time she executed the agreement.

But plaintiff argues that defendant had a duty to disclose because she had superior

knowledge that was not within the fair or reasonable reach of CCC and that could not have been discovered prior to execution of the agreement.

8.    A party to a business transaction has a duty to disclose "[f]acts basic to the transaction, if he knows that the other is about to enter into the transaction under a mistake as to such facts, and that the other, because of the relationship between them, the customs in the trade, or other objective circumstances, would reasonably expect a disclosure of such facts." *Griffith,* 510 P.2d at 203 (citation omitted).

9.    This court has held that the superior knowledge arising from unequal access to information does not by itself create a duty to disclose. *See Great Plains*, 399 F. Supp. 2d at 1195.  To create a duty, the superior knowledge must be paired with an unequal relationship between the parties. *Id.*

10.   Here, any inequality in the parties' relationship weighs in favor of plaintiff and against defendant.  Plaintiff made the offer; plaintiff submitted the offer to defendant on its standard form; and plaintiff was in the most favorable bargaining position.  Therefore, the court cannot find that the disparity of bargaining power imposed a duty to disclose upon defendant.

11.   While the court does not approve of defendant's actions, plaintiff has not established by clear and convincing evidence that they constitute fraud by silence under Kansas law.

12.   Plaintiff also argues that defendant affirmatively represented that the Severance Agreement was the Original Severance Offer when she said, "[h]ere it is."  The court disagrees.  Nothing in the record that indicates "it" referred to the Original Severance Offer.  The court finds that defendant's statement is not a false representation.

13.   The court holds that the Severance Agreement is not invalid based on plaintiff's alleged

fraud by silence or affirmative misrepresentations.

**Authority**

14.  Plaintiff argues that the Severance Agreement is invalid because Ms. Flanigan did not have actual or apparent authority to execute the agreement.

15.  A party relying on the alleged agency relationship bears the burden "of establishing its existence by clear and satisfactory evidence." *Town Center*, 148 P.3d at 569.

16.  Actual authority exists when the principal has "delegated authority to the agent by words which expressly authorize the agent to a delegable act." *Mohr v. State Bank of Stanley*, 734 P.2d 1071, 1075 (Kan. 1987).

17.  Mr. Cutler made defendant a specific offer, which was outlined in the Original Severance Offer.  Based on the usual protocol of CCC, Mr. Cutler and Ms. Flanigan knew that Ms. Flanigan could execute the Original Severance Offer, but that she could not agree to any other terms.  The Severance Agreement contains a mutual release that was not included in the Original Severance Offer.  Mr. Cutler never gave Ms. Flanigan express authorization to agree to the terms of the Severance Agreement.  Her authority was limited to executing the original offer.  The court finds that Ms. Flanigan did not have actual authority to enter into the Severance Agreement on behalf of CCC.

18.  "In cases where actual authority is absent, Kansas recognizes the doctrine of apparent or ostensible agency: 'An ostensible or apparent agency may exist if a principal has intentionally or by want of ordinary care induced and permitted third persons to believe a person is his or her agent even though no authority, either express or implied, has been actually conferred upon the agent.'" *Town Center*, 148 P.3d at 569 (citing *Dealers Leasing, Inc. v. Allen*, 994 P.2d 651 (Kan. Ct. App. 1999)).

-11-

19.     Defendant contends that Mr. Cutler permitted defendant to believe that Ms. Flanigan had authority to negotiate and execute the Severance Agreement when he told her to have contact with the Human Resources Department regarding the severance process and executing the Original Severance Offer.[2]  Mr. Cutler never told defendant that Ms. Flanigan had authority to alter the terms of the offer.  And both Mr. Cutler and defendant knew that defendant was aware of the usual protocol for severance agreements and that each agreement had to be personally approved by Mr. Cutler.  Defendant had actual knowledge that the Human Resources Department oversaw the severance process but no authority to change the terms of the severance offers.  The court finds that Mr. Cutler's actions did not induce defendant into believing that Ms. Flanigan had authority to agree to the new terms or to execute the Severance Agreement.

20.     The court also finds that Ms. Flanigan's actions did not induce defendant into believing that Ms. Flanigan had authority to execute the Severance Agreement.  When defendant gave Ms. Flanigan the Severance Agreement, defendant knew that it was different than the Original Severance Offer.  Because defendant had been the head of the Human Resources Department, she also knew that Ms. Flanigan did not have authority to sign the document without having the new terms approved by Mr. Cutler.  Defendant watched Ms. Flanigan skim through the document and sign it.  At the time defendant witnessed Ms. Flanigan execute the Severance Agreement, defendant knew that Ms. Flanigan had not obtained approval from Mr. Cutler to agree to the new terms.

21.     Neither Mr. Cutler's nor Ms. Flanigan's actions indicated that anyone other than Mr. Cutler

---

[2] Defendant did not attach Mr. Cutler's deposition and the deposition is not before the court, but even assuming this fact to be true, it would not change the outcome of the court's analysis.

could agree to the additional terms defendant sought.  The court, therefore, finds that Ms. Flanigan did not have apparent authority to execute the Severance Agreement on behalf of CCC.

### Ratification

22.   Defendant argues that even if Ms. Flanigan lacked authority to enter into the agreement, CCC ratified the agreement by making severance payments and offering services as provided for in the agreement.

23.   As the Kansas Court of Appeals explained in *Town Center*, "[t]he key to ratification is knowledge of the unauthorized act; without a showing of the principal's knowledge, the principal cannot be deemed to have ratified the act." 148 P.3d at 571 (citing *Brown v. Wichita State Univ.*, 540 P.2d 66 (Kan. 1975).  But the principal must repudiate the unauthorized act as soon as he discovers it.  *Id.*

24.   Mr. Cutler learned about Ms. Flanigan's unauthorized act—approving terms that varied from the Original Severance Offer—on or about December 7, 2004.  He quit preforming under the agreement that day and notified defendant that he was repudiating the agreement on December 15, 2004.

25.   The court finds that CCC timely repudiated the Severance Agreement, and thus, did not ratify Ms. Flanigan's unauthorized act.

   **IT IS THEREFORE ORDERED** that defendant's Motion to Strike Evidence Relating to Lack of Authority (Doc. 80) is denied.

   **IT IS FURTHER ORDERED** that the Severance Agreement is invalid.

   **IT IS FURTHER ORDERED** that Magistrate Judge Waxse will set this case for a status conference, in accordance with his January 11, 2006, ruling..

Dated this 31st day of January 2007, at Kansas City, Kansas.


**s/ Carlos Murguia**
**CARLOS MURGUIA**
**United States District Judge**